# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

---

MAYOR AND CITY COUNCIL OF
BALTIMORE
City Hall – Room 250
100 N. Holliday Street
Baltimore, MD 21202
Baltimore County,

CITY OF GAITHERSBURG, MARYLAND
31 S. Summit Avenue
Gaithersburg, MD 20877
Montgomery County,

MARYLAND STATE SENATOR JEFF
WALDSTREICHER
James Senate Office Building, Room 216
11 Bladen Street
Annapolis, MD 21401
Anne Arundel County,

FRIENDS OF IMMIGRANTS,[1]

IMMIGRANT LAW CENTER OF
MINNESOTA
450 N. Syndicate Street #200
St. Paul, MN 55104,

JEWISH COMMUNITY RELATIONS
COUNCIL OF GREATER WASHINGTON
6101 Executive Boulevard, Suite 300
North Bethseda, MD 20852
Montgomery County,

THE JEWISH COUNCIL FOR PUBLIC
AFFAIRS
1775 K Street N.W.
Washington, D.C. 20006,

Case No. _____

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

---

[1] Friends of Immigrants concurrently moves to waive its obligation under Local Rule 102.2(a) to provide an address on the basis that the organization is a voluntary association, not incorporated, and has no official place of business.

TZEDEK DC
UDC David A. Clarke School of Law
4340 Connecticut Ave. N.W., Suite 319
Washington, D.C. 20008,

                    Plaintiffs,

          v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY
3801 Nebraska Avenue, N.W.
Washington, D.C. 20016,

KEVIN K. McALEENAN, in his official
capacity as Acting Secretary of the United
States Department of Homeland Security
3801 Nebraska Avenue, N.W.
Washington, D.C. 20016,

UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES
20 Massachusetts Avenue, N.W.
Washington, D.C. 20529,

KENNETH T. CUCCINELLI II, in his
official capacity as Acting Director of
United States Citizenship and Immigration
Services
20 Massachusetts Avenue, N.W.
Room 4210, MS 2120
Washington, D.C. 20529,

                    Defendants.

## INTRODUCTION

1.   Last fall the U.S. Department of Homeland Security ("DHS") proposed a new set of

regulations that, by the agency's own account, would make it substantially more difficult for

lawful immigrants to qualify for permanent legal resident status.[2] The new rules are designed to expand the universe of persons the agency may permissibly characterize as likely to become "public charges" and thus ineligible to become permanent legal residents. Departing from more than a century of judicial precedent, as well as the agency's own decades-long practices, the new rule would label not only the destitute and those primarily reliant on government cash assistance as persons likely to become "public charges," but also millions of immigrants holding down full time, but low-paying, jobs. This rule would treat a lawful immigrant's receipt of even nominal levels of non-cash assistance (such as rental vouchers, medical services or food) for periods as short as four months as a "heavily-weighted" negative factor in that individual's application for permanent residence status, even where the individual is fully-employed.

2. DHS received over a quarter million public comments that the agency itself characterized as overwhelmingly opposed to the proposed rule. Yet, the agency's final rule actually makes it even harder for lawful immigrants to qualify for permanent legal residence than the proposed rule. *See Inadmissibility on Public Charge Grounds*, Final Rule, 84 Fed. Reg. ("FR") 41282 (Aug. 14, 2019) ("Public Charge Rule" or "Rule"). The Rule violates the Administrative Procedures Act and should be vacated for several reasons: 1) it lacks an adequate—or in several respects, any—justification and the stated justification is contrary to the evidence; 2) it overrides longstanding agency policy on which substantial reliance interests have developed, without adequate evidence to establish the need for the change; 3) DHS failed to perform an adequate cost-benefit analysis, and it failed to address substantive comments

---

[2] U.S. Citizenship and Immigration Servs., U.S. Dep't of Homeland Security, Inadmissibility on Public Charge Grounds, 83 Fed. Reg. 51,114-01, 51,198, to be codified at 8 C.F.R. pts. 103, 212, 213, 214, 245, and 248) (Oct. 10, 2018).

CORE/2052922.0049/154461210.5

concerning the harms the Rule will cause; 4) DHS failed to follow notice and comment procedures by publishing a final Rule which was substantively different from the Proposed Rule, without providing an opportunity for public comment on the new Rule; and 5) it is motivated by race, ethnic, and national origin bias in violation of the constitutional right to equal protection.

3.  The Public Charge Rule makes dramatic changes to immigration policy that are designed to reduce legal immigration levels and to disfavor poorer immigrants and immigrants of color. Initially DHS ticked off the boxes for notice and comment, but it flouted the intent of this process by relying on racial, ethnic, and national origin bias, while ignoring the actual evidence, including that presented in public comments, and then promulgating a final rule that was substantively different. Predictably, the result is illogical. DHS's stated objective— to ensure that immigrants granted permanent legal status do not become a burden on taxpayers—runs directly counter to the evidence of its impact. The federal government's own studies show that new immigrants are more likely than the U.S. born population to join and stay in the workforce, and thus to pay taxes. Data from the government's own Census Bureau indicates that the Rule will increase, not decrease, the overall burden on taxpayers. With a declining birthrate among native born Americans, an increasing flow of immigrants is needed simply to replace those who leave the workforce through death or retirement. By reducing the level of legal immigration, the Public Charge Rule will place an even greater burden on the declining number of tax-paying native-born Americans still in the workforce to support those dependent on Social Security, Medicare, Medicaid and a variety of other government

CORE/2052922.0049/154461210.5

services.[3] Thus, the Public Charge Rule is worse than a solution in search of a problem. It is a problem, in and of itself.

4.  Plaintiffs are a broad-based coalition comprised by local governments, an elected representative, and a number of non-profit and faith-based agencies providing legal and social services to immigrant populations and their families. Plaintiffs, the constituents they serve and the communities they represent will suffer actual injury as a result of the Public Charge Rule. The Public Charge Rule will place a greater burden on health care, food security, housing assistance and other services Plaintiffs provide. Immigrants and their citizen family members, afraid of being designated public charges and jeopardizing legal status, will disenroll from or forgo participation in federal nutrition, health care and housing programs to which they are lawfully entitled. This will place a greater burden not only on non-profit social service agencies, but also on state, local and county government assistance programs. In addition, when immigrants and their citizen family members withdraw altogether from government assistance programs, including those provided by the Mayor and City Council of Baltimore ("Baltimore") and by Gaithersburg, those jurisdictions' public health and safety and general welfare is harmed.

## JURISDICTION AND VENUE

5.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this case arises under the Constitution and laws of the United States.

6.  This Court has authority to grant the requested declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202. Publication of the Public Charge Rule in the Federal Register, 84

---

[3] Comments of the Immigrant Law Center of Minnesota, et al. (filed December 10, 2018), pp. 10-14, https://www.regulations.gov/document?D=USCIS-2010-0012-47454.

Fed. Reg. ("FR") 41282 (Aug. 14, 2019), constitutes final agency action and thus is reviewable by this Court. 5 U.S.C. §§ 704 and 706.

7.     Venue is appropriate in this district because Defendants are United States agencies or officers sued in their official capacities, because this district is where a substantial part of the events or omissions giving rise to the claim occurred, 28 U.S.C. §§ 1391(b)(2), (e)(1), and because Plaintiffs Baltimore, Gaithersburg, State Senator Jeff Waldstreicher and the Jewish Community Relations Council of Greater Washington reside and provide services in this district. 28 U.S.C. § 1391(e)(1).

## PARTIES

8.     Plaintiff Mayor and City Council of Baltimore[4] is a municipal corporation, organized pursuant to Articles XI and XI-A of the Maryland Constitution, and entrusted with all of the powers of local self-government and home rule afforded by those articles. Baltimore is the largest city in Maryland and the thirtieth largest city in the United States, with a population of more than 600,000, according to 2016 Census estimates.

9.     "Over the course of the 20th century, Baltimore has welcomed many immigrants from all around the world."[5] More recently, Baltimore has become yet another "story of large influxes of immigrants bringing new vibrancy to America's storied, yet aging cities."[6] As of 2016,

---

[4] "Baltimore" refers to Plaintiff, the municipal corporation. "City" or "City of Baltimore" refers to the geographic jurisdiction.

[5] *The Role of Immigrants in Growing Baltimore*, City of Baltimore 4 (Sept. 2014) [hereinafter The Role of Immigrants], https://www.abell.org/sites/default/files/publications/cd-role immigrants914.pdf.

[6] *Id.*

more than 48,000 foreign-born immigrants called the City of Baltimore home,[7] with more than half of that population arriving since 2000.[8] Baltimore's immigrant population is majority Latin American, African, and Asian.[9]

10. Baltimore views it as "crucial that [Baltimore] recognizes, expands, and develops new strategies to welcome immigrants and help facilitate an easy transition to life as Baltimoreans so these immigrants choose to make [the City] their permanent home."[10] Approximately 7.2 percent of all immigrants in the City were entrepreneurs in 2016.[11] Thus, "attracting additional immigrants to the [C]ity would make a significant difference in the [C]ity's future economic prospects."[12]

11. Baltimore strives to show immigrant communities that it is a welcoming City by promoting their wellbeing, economic development, and integration. Baltimore does so by providing health care services (including immunizations), early childhood education, nutrition assistance to school children, fire and police protection, as well as housing and job training services. Facilitating the development and progress of immigrants in civic life, including within the workforce and the greater economy, the City's religious and cultural life, and neighborhood and political affairs promotes the growth, prosperity, public health and public safety of the City as a whole. In addition, as a welcoming city, Baltimore seeks to enhance

---

[7] *Selected Characteristics of the Native and Foreign-Born Populations, 2012-2016 American Community Survey 5-Year Estimates*, U.S. Census Bureau, https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk.

[8] *The Role of Immigrants*, at 5.

[9] *Id.*

[10] *Id.*

[11] *NAE Cities Index*, New Am. Econ. 11, https://www.newamericaneconomy.org/wp-content/uploads/2018/09/NAE-Cities-Index-COmplete-Data.pdf.

[12] *The Role of Immigrants*, at 6.

CORE/2052922.0049/154461210.5

the service capacity and receptivity of its government agencies, and of the wider nonprofit and community-based organization safety net, to better address the needs of immigrants and facilitate inclusion and mutual understanding among immigrant communities, service providers, and receiving communities.

12. Immigrants in the City of Baltimore and their families may refuse to accept public benefits and services—even if they need them—if they fear immigration consequences. In 2012, then-Mayor Stephanie Rawlings-Blake issued an executive order stating that "[t]he City of Baltimore remains committed to ensuring public safety, public health, and vital services on which the entire community depends."[13] For that reason, she directed that "[n]o City Department, agency, officer or employee shall condition the provision of City services or benefits on the immigration status of the individual seeking those services or benefits unless such conditions are lawfully imposed by federal or state law."[14] For its efforts, Baltimore received the second-highest score in the county in one study of the integration of immigrants into local communities.[15]

13. The Public Charge Rule will harm Baltimore by sowing confusion among immigrants and their families as to the consequences of accepting public benefits, and chilling them from pursuing such benefits. As a result, immigrants will take advantage of fewer public benefits, or will shift from federal programs – like Medicaid – to in-kind local programs – like free or reduced-cost Baltimore City Health Department ("BCHD") clinics.

---

[13] *Baltimore City Executive Order: Advancing Public Safety and Access to City Services*, City of Baltimore 1, https://content.govdelivery.com/attachments/MDBALT/2012/03/01/file_attachments/97683/exec001.pdf.

[14] *Id.* at 2.

[15] *NAE Cities Index*, New Am. Econ., https://www.newamericaneconomy.org/interactive-index/.

CORE/2052922.0049/154461210.5

14. Plaintiff the City of Gaithersburg, Maryland ("Gaithersburg") is the fourth largest incorporated city in the state of Maryland, with a population of about 70,000, nearly 40% of whom are foreign-born. Gaithersburg's Community Services Division implements and supports assistance programs encompassing interim case management, community outreach, education, housing counseling, financial wellness, emergency assistance and safety-net services, and it provides resources and referrals to Gaithersburg residents in need. The Division of Housing and Community Development maintains comprehensive housing policies and programs that provide fair, affordable options in homeownership and rental opportunities. Housing programs administered by Gaithersburg include closing cost and down payment assistance for first-time homebuyers and deferred loans for homeowners and qualified tenants who wish to make their homes accessible for anyone with a disability. The Homeless Services Division is responsible for homeless advocacy, community education on homelessness, outreach services, housing, and linking homeless individuals to needed services. Gaithersburg and its community partners offer a number of programs and services to ensure that those facing hunger have access to healthy foods throughout the year, including the Student Supper Program, through which the City of Gaithersburg Olde Towne Youth Center provides free, nutritious suppers to children ages 18 and under. Gaithersburg also provides information, referrals and navigation assistance for a myriad of services offered by local, federal and state agencies, and nonprofit organizations, including in the areas of immigration, housing, health, and mental health.

15. The Public Charge Rule is harming Gaithersburg by creating uncertainty about immigrant eligibility for permanent residence status and causing immigrants and their family members to forgo federal assistance to which they are entitled. As a result, immigrants and their

families will increasingly rely on City-run health, nutritional, homelessness and social service programs, as well as on similar programs operated by non-profit organizations that receive City funds. This will put a strain on and divert Gaithersburg's resources from other priorities and, because many resident may forgo use of public benefits altogether, the Public Charge Rule will adversely affect the health of Gaithersburg's residents.

16. Plaintiff Maryland State Senator Jeff Waldstreicher ("State Senator Waldstreicher") serves Maryland District 18, which is home to about 120,000 persons, about one third of whom are foreign born. Twenty-five percent of District 18 identifies as Hispanic, making it the largest population of Hispanic residents in Montgomery County and the second largest population of Hispanic residents in the state.

17. The Public Charge Rule is impeding State Senator Waldstreicher's ability to safeguard the health and wellbeing of his constituents by causing immigrants and their family members to forgo federal assistance to which they are entitled. As a result, to the extent immigrants and their families continue to access government benefits at all, they will increasingly rely on state-run health, nutritional, and social service programs, as well as on similar programs operated by non-profit organizations that receive state funds. The Public Charge Rule has also had and will continue to have a chilling effect and significant negative impact on public health in in his district. The immigrant residents and their family members within Senator Walstreicher's district face significant obstacles in bringing this suit on their own, "as they may hold a credible fear that suing the federal government would torpedo" their chances or the chances of their family members to obtain permanent residence status. *See Mayor and City Council of Baltimore v. Trump, et al*, Case 1:18-cv-3636-ELH, 2019 WL 4598011, at *18 (D. Md. September 20, 2019).

CORE/2052922.0049/154461210.5

18. Plaintiff Friends of Immigrants ("FOI") is a volunteer organization based in Red Wing, Goodhue County, Minnesota. FOI publicly supports immigrants and recognizes their economic, cultural, social, and individual importance in the Goodhue County community. Among its functions, FOI supports immigrants in navigating local resources to obtain the benefits to which they are entitled. FOI also acts to promote immigrants' rights more generally.

19. The Public Charge Rule has harmed and will continue to harm FOI by straining its resources to help immigrants become fully integrated into the community. The Rule's adverse impacts are already being felt, as persons who would otherwise qualify for benefits that would help them fully participate in the community are disenrolling or choosing to forgo these benefits out of fear of that it will impact their efforts to become legal residents or citizens. As a result, FOI must divert resources from its existing programs to educate and to assist immigrants in navigating the new rules.

20. Plaintiff Immigrant Law Center of Minnesota ("ILCM") enhances opportunities for immigrants and refugees through legal representation for low-income individuals, and through education and advocacy with diverse communities. ILCM serves immigrants and refugees residing in the state of Minnesota who earn less than 187.5 percent of federal poverty guidelines. In 2018, ILCM served clients coming from 112 countries, with 36 percent of ILCM cases originating from Mexico, 19 percent from countries in Central and South America, 20 percent from countries in Asia, 20 percent from countries in Africa, and the remaining 5 percent from countries in Europe, Oceania, and from Canada.

21. ILCM provides a wide range of legal services to low-income immigrants and refugees, including:

- Assisting clients in preparing and presenting citizenship applications, and in passing exams; reuniting families by helping citizens and permanent residents to petition for family members abroad; keeping families together through family petitions; and preventing the separation of families by providing representation for persons in removal proceedings;

- Assisting families and individuals in filing asylum applications; assisting battered immigrant women and children in filing Violence against Women Act petitions; assisting victims of serious crimes in obtaining U-Visas;

- Providing legal representation for young immigrants through its DREAMers Immigration Project;

- Pursuing judicial appeals to vindicate the constitutionally-guaranteed rights of immigrants;

- Advocating for fair and comprehensive immigration reform; and

- Educating immigrants, professionals, and the general community about immigration and the issues faced by immigrants and refugees.

22. Since its beginning, ILCM has assisted tens of thousands of immigrants to secure legal status in the United States and to overcome the challenges of obtaining work authorization and citizenship. In 2018, ILCM provided legal services in 4,270 unique cases with clients from 112 countries. It reached more than 5,400 individuals through more than 130 education and advocacy presentations, in addition to numerous appearances on radio and television. Its services help break down barriers and make meaningful improvements to immigrant families' lives, allowing them a safe and sustainable future in Minnesota.

23. The Public Charge Rule has harmed and will continue to harm to ILCM. ILCM's mission of advocating for the rights of low-income immigrant communities is inseparable from the interests of its clients in not being denied admission or adjustment of their immigration status,

in receiving vital public benefits, and in maintaining family integrity and unity. Defendants' actions have caused the organization to divert resources to educate its staff on the new Public Charge Rule. In August 2019 alone, ILCM's staff spent considerable amounts of time away from normal duties learning the intricacies of the new Rule, interacting with partners at various legal aid organizations, organizing educational materials, planning training sessions and community information options in case the Rule goes into effect, and meeting with community partners who are concerned about both the Public Charge Rule's adverse actual and chilling effects for immigrants.

24. Defendants' actions also will cause ILCM's staff to spend additional time with each client, thus diverting additional resources from the organization, to educate them about the Rule, to address the modified "totality of the circumstances" factors as applied to each client's situation, to document the new form I-944, and to demonstrate why the client is not likely to become a public charge under the newly adopted definition. Because ILCM's staff currently operates at capacity and has a waitlist of potential new clients, these extra hours will create significant delays and otherwise strain ILCM's limited resources.

25. Beside the adverse impact on ILCM's resources in dealing with potential and accepted cases, a further strain on its resources has already occurred and will continue in educating clients who are not subject to the Public Charge Rule, but are nonetheless fearful about their status if they obtain public benefits for themselves or their children. Another strain resulting from the Rule concerns ILCM's interactions with various state and private organizations that work with refugees with health issues or who have suffered domestic violence, either in the form of individual consultations with ILCM on behalf of their clients or through ILCM-led staff trainings on the new Public Charge Rule.

CORE/2052922.0049/154461210.5

26. Plaintiff the Jewish Community Relations Council of Greater Washington ("JCRC") represents over 100 constituent Jewish agencies, organizations and synagogues in the District of Columbia, Northern Virginia and suburban Maryland. The JCRC serves as the chief advocate for the DC area Jewish community to elected officials, government agencies, other faith and ethnic communities, and the media. Among its other work, the JCRC has a long history of advocacy and community engagement on public policy issues directly impacting local refugee and immigrant populations. As an outgrowth of American Jews' history as an immigrant population fleeing devastating persecution and poverty, the Jewish community has consistently championed the rights of refugees and immigrants to be treated with fairness and compassion as they seek safety and security in the United States.

27. Over the last two years JCRC has partnered with organizations such as HIAS, CASA, and VACALAO to: (1) support legislation that protects immigrant and refugee populations and the agencies that serve them; (2) mobilize Jewish lawyers to provide pro bono assistance to immigrants pursuing naturalization; and (3) sponsor programming highlighting our community's moral commitment to the core American value of being a welcoming society for all. JCRC's members include:

- The Jewish Social Service Agency ("JSSA"), which provides social services including meals, counseling, immigration resettlement, early childhood services, home care services for senior citizens, services for individuals with special needs, and health care to community members. JSSA staff includes home care service workers, many of whom are foreign born and who rely on non-cash assistance.

- The Jewish Foundation for Group Homes ("JFGH"), which provides individuals with developmental disabilities and/or chronic mental disorders with the opportunity to live

14

independently within the community with dignity, personal choice and respect regardless of faith or creed. JFGH's programs support more than 200 individuals in over 70 sites throughout the Washington metropolitan area. JFGH staff includes home care service workers, many of whom are foreign born and who rely on non-cash assistance.

- The Jewish Council for the Aging of Greater Washington ("JCA"), through its Albert & Helen Misler Adult Day Center in Rockville has been offering activities, nursing and social work services for older adults who are frail, ill, or cognitively impaired. JCA's Senior Community Service Employment ("SCSEP") provides on-the-job training for low income job seekers age 55+ in Montgomery and Frederick Counties. In addition, the program helps to staff WorkSource Montgomery's American Job Center in Wheaton by providing a part-time, onsite specialist on older workers. SCSEP serves 48-75 interns in any given week, 50 percent of whom are foreign born. Their homelands include Peru, Ghana, Ethiopia, Eritrea, Iran, and Panama. JCA staff includes home care service workers, many of whom are foreign born and who rely on non-cash assistance.

28. The Public Charge Rule has harmed and will continue to harm JCRC and its members, as it creates uncertainty about immigrant eligibility for permanent residence status and causes immigrants and their family members to forgo federal assistance to which they are entitled. As a result, immigrants and their families will increasingly rely on JCRC's and its members' programs for assistance in navigating this new terrain. Home care agencies and nursing facilities like those operated by JCRC member agencies report "a growing shortage of aides, thanks to a combination of low wages, a strong economy, and past curbs on immigration. The market is so tight that some agencies are requiring their workers to sign non-compete

agreements to prevent them from moving to competitors or working directly for their clients."[16]

29. "And the shortage will only get worse as the Baby Boomers age. According to CareerCast, Americans will require a half-million more home health aides and 750,000 more personal care aides by 2025."[17] "According to Robert Espinoza of the Paraprofessional Healthcare Institute (PHI), about one-quarter of the nation's 4 million direct care workers are immigrants. Because their wages are so low, about 43% of these immigrant workers access some public benefits." Two thirds of these individuals "receive Medicaid and more than half get food and nutrition assistance." The new rules do not apply to current green card holders, but "they effectively will end the pipeline for new workers in an industry with notoriously high turnover."[18] Experts at the Urban Institute "estimate that even in response to the proposed Public Charge Rule, about one-in-five low-income workers did not apply or withdrew from government benefit programs."[19]

30. "Others will work off-the-books. And some will, as the Administration intends, avoid coming to the U.S."[20] And that "will dramatically shrink the workforce available to assist frail elders and younger people with disabilities,"[21] harming JCRC members in their ability to provide quality care.

---

[16] Howard Gleckman, *How Frail Elders will Pay For Trump's New Anti-Immigrant Rules*, https://www.forbes.com/sites/howardgleckman/2019/08/12/how-frail-elders-will-pay-for-trumps-new-anti-immigrant-rules/#3ddaa04d5b44. Howard Gleckman is a member of the board of JCA.

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

CORE/2052922.0049/154461210.5

31. Plaintiff the Jewish Council for Public Affairs ("JCPA") is the national hub for more than 125 local Jewish Community Relations Councils, and 17 national Jewish agencies. Its mandate is to advance the interests of the Jewish people to, among other things, promote a just American society. In this regard, and relevant to the Public Charge Rule, it has adopted policies (1) to combat stereotypes about immigrants, (2) to maintain support for fair and generous legal immigration policies as an expression of our country's core values of refugee protection, family reunification and economic opportunity and (3) to work to ensure that those seeking to enter the country legally with the intention to settle here permanently are afforded a reasonable, effective, and judicious process, and that a rational and timely mechanism be developed to establish immigrants' status.

32. JCPA's Local Member Agencies are 125 Jewish Community Relations Councils or Committees around the country that provide social services on a non-sectarian basis to members of their communities, including immigrants and their family members, including:

- The Jewish Federations of North America—comprised of 147 Jewish Federations across North America—identifies, supports and addresses the full range of social service issues, provides lifesaving humanitarian relief, and supports breakthrough programs for all ages. The Jewish Federations of North America raise and distribute more than $3 billion annually for social welfare, social services, and educational needs.

33. The Public Charge Rule has harmed and will continue to harm the JCPA by creating uncertainty about immigrant eligibility for permanent residence status and causing immigrants and their family members to forgo federal assistance to which they are entitled. As a result, immigrants and their families will increasingly rely on JCPA-run programs for assistance in navigating the new terrain.

CORE/2052922.0049/154461210.5

34. Plaintiff Tzedek DC provides pro bono legal assistance and advocacy services to safeguard the legal rights of low-income DC residents dealing with often unjust, abusive, and illegal debt collection practices, as well as other consumer protection problems like credit reporting issues, identity theft, and predatory lending. Tzedek DC provides low-income members of the community, including immigrants, direct free legal services. Tzedek DC also provides systemic and policy advocacy on behalf of client communities, and, in concert with its community partners, preventative financial empowerment and community education programming in English and Spanish. By addressing debt-related legal issues before they become irreversible, catastrophic crises, Tzedek DC enhances the overall stability and financial health of low-income DC families, including immigrants and their families.

35. The Public Charge Rule has harmed and will continue to harm Tzedek DC. The organization's mission of safeguarding the rights and interests of low-income immigrants residing in the DC area who are facing debt-related problems will be frustrated because the Rule places inappropriate weight on credit report information that is often inaccurate and unreliable. Tzedek DC's immigrant clients who timely pay bills (such as rent and utilities) that are not reported to credit reporting agencies will be adversely impacted by the Rule. In addition, Tzedek DC's immigrant clients will tend to have newer credit histories and lower credit scores and will be negatively impacted by the Rule for this reason as well. Immigrant clients who cannot pay medical debts will face potential adverse immigration consequences under the Rule, forcing such clients to consider redirecting funds from their grocery or rent budgets to pay medical debt or to forgo medical care entirely. Tzedek DC already has had to expend resources to advise community partners and clients of the harms of the Rule, which has diverted resources away from pursuing its mission and serving low-income DC residents

CORE/2052922.0049/154461210.5

who would otherwise benefit from its services. Tzedek DC has also launched a bilingual know your rights information campaign designed to serve DC area immigrant households called "Sin Deudas, Sin Dudas," Spanish for "No Debt, No Doubt." If the Public Charge Rule stands, resources from this information campaign will be diverted to advise community partners and clients of the harms of the rule.

36. During the public notice-and-comment period regarding the Public Charge Rule, Plaintiffs City of Baltimore, City of Gaithersburg, State Senator Waldstreicher, FOI, ILCM, JCRC, JCPA, and Tzedek DC submitted detailed comments documenting numerous harms the Public Charge Rule would inflict on their missions, their members, their clients, their immigrant communities, and surrounding communities.[22] Plaintiffs' comments highlighted the expected adverse effects that the Public Charge Rule would inflict on immigrants and refugees who are reliant on DHS's longstanding policy, described below, that did not consider temporary non-cash public benefits as evidence that an individual was not self-sufficient.

37. Plaintiff Tzedek DC also jointly submitted with 49 consumer, civil rights, economic justice, faith, privacy, and advocacy organizations an additional comment opposing the Public Charge Rule's radical expansion of the programs and factors to be considered in a public charge analysis, particularly the provision that requires USCIS to consider an immigrant's credit history and credit score in the public charge determination as ill-advised and inappropriate.

---

[22] Comments of Tzedek DC on Proposed Public Charge Rule, https://www.regulations.gov/document?D=USCIS-2010-0012-46339.

CORE/2052922.0049/154461210.5

38. Plaintiff Mayor and City Council of Baltimore submitted two comments opposing the proposed Rule, one as part of a collaboration effort with a number of other municipalities, and one as the sole signatory.[23]

BACKGROUND

## II. THE "PUBLIC CHARGE" EXCLUSION HAS LONG BEEN INTERPRETED TO APPLY ONLY TO PERSONS WHO ARE PRIMARILY DEPENDENT ON GOVERNMENT CASH ASSISTANCE.

39. The term "public charge" has since its inception referred to persons who cannot care for themselves and are thus primarily dependent on the government to avoid destitution. The predecessor agency to DHS, the Immigration and Nationalization Service ("INS"), noted in 1999 that the "primary dependence model of public assistance was the backdrop against which the 'public charge' concept in immigration law developed in the 1800s." 64 F.R. 28676 (May 26, 1999).

40. The term first appeared in an 1882 law barring the admission into the United States of "any convict, lunatic, idiot, or any person unable to take care of himself or herself without becoming a public charge." An Act to Regulate Immigration, ch. 376, § 2, 22 Stat. 214 (1882).

41. Since then, Congress has re-employed the term "public charge" over the years including in 1891, 1903, 1907, 1917, 1952, 1990, and 1996 without expanding its meaning to include non-cash benefits, even as public assistance programs expanded over the years.

---

[23] See Comments of New York City, Chicago, U.S. Conference of Mayors, et al. (multi-city comment-USCIS-2010-0012), https://www.regulations.gov/contentStreamer?documentId=USCIS-2010-0012-62861&attachmentNumber=1&contentType=msw12. *See also*, Comments of Catherine E. Pugh, Mayor of Baltimore, https://www.regulations.gov/contentStreamer?documentId=USCIS-2010-0012-51407&attachmentNumber=1&contentType=pdf.

42. In 1952 Congress enacted the Immigration and Naturalization Act. Pub. L. 414, ch. 2, 66 Stat. 163, codified at 8 U.S.C. § 1101 *et seq.* (1952). Section 212 of that Act excluded from admission individuals "who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission, are likely at any time to become public charges." *Id.* § 212(a)(15), 66 Stat. 163, 183, 8 U.S.C. § 1182(a)(4)(A).

43. The longstanding interpretation of the term "public charge" in these statutes had consistently been and continued after 1952 to be limited to a person who is destitute. As the Bureau of Immigration Appeals held, "[t]he words 'public charge' had their ordinary meaning: that is to say, a money charge upon or an expense to the public for support and care, the alien being destitute." *Matter of Harutunian*, 14 I. & N. Dec. 583, 586 (BIA 1974) (citations omitted).

44. Congress has not altered this well-established meaning of "public charge," despite revisiting the topic on many occasions.

45. For example, in 1965, Congress reversed previous national policy that restricted immigration from certain global regions and opened the U.S. to immigrants from all over the world without modifying the well-established meaning of public charge. Immigration and Naturalization Act of 1965, Pub. L. No. 89-236.

46. In 1986, Congress enacted the Immigration Reform and Control Act ("IRCA"), without modifying the "public charge" definition. Instead, Congress provided additional grounds for waivers allowing individuals deemed a public charge to overcome that determination and obtain admission. 8 U.S.C. § 1255a(d).

47. In 1987, the INS promulgated a regulation clarifying that applicants would not be subject to exclusion on public charge grounds if "the applicant demonstrates a history of employment

CORE/2052922.0049/154461210.5

in the United States evidencing self-support without the receipt of *public cash assistance*." Adjustment of Status for Certain Aliens, 52 FR 16205, 16211 (May 1, 1987) (emphasis added), codified at 8 C.F.R. 245A. The INS defined "public cash assistance" as "income or needs-based monetary assistance . . . designed to meet subsistence levels [such as 'supplemental security income']." *Id*. at 16,209. The agency specifically excluded "assistance in kind, such as food stamps, public housing, or other *non-cash benefits*" from those benefits that would be considered in determining whether to render an individual a public charge. *Id*. (emphasis added). In addition, the regulation excluded from public charge consideration Medicare, Medicaid, emergency treatment, services to pregnant women or children under 18 years of age, or treatment in the interest of public health). *Id.*

48. Congress again declined to alter the "public charge" test in the Immigration Act of 1990, despite making a number of other changes to immigration-related statutes. Pub. L. No. 101-649 (Nov. 29, 1990), 8 U.S.C. § 1101 et seq.

49. In 1996, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), which imposed restrictions on immigrant eligibility for certain public benefits. However, Congress did not alter the "public charge" test in this statute.

50. Congress again declined to change the meaning of "public charge" one month after passing the PRWORA, when it enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), which codified the totality–of-the-circumstances test that had been developed in case law and administrative policies. 8 U.S.C. § 1182(a)(4)(B)(i). At that time, Congress considered but rejected an expanded definition of "public charge" that would have included individuals who received "federal public benefits for an aggregate of 12 months over a period of 7 years." 142 Cong. Rec. S11882 (daily ed. Sept. 30, 1996).

CORE/2052922.0049/154461210.5

51. IIRIRA also introduced a provision that allowed the use of an affidavit of support as a means that could be used to help an immigrant overcome the public-charge barrier, so long as the sponsor of the affidavit pledged to maintain the sponsored immigrant's income at or above 125 percent of the federal poverty level. 8 U.S.C. §§ 1182(a)(4)(B)(ii); 1183a(a)(1)(A).

52. Upon learning that enacting both PRWORA (making immigrants ineligible for certain federal benefits) and IIRIRA (codifying the totality of the circumstances test for "public charges") in the same year had caused confusion, the INS and the State Department published several documents to confirm that the longstanding historic understanding of the term "public charge" remained operative.

53. In 1997, the INS issued internal guidance explaining that the IIRIRA "has not altered the standards used to determine the likelihood of an alien to become a public charge nor has it significantly changed the criteria to be considered in determining such a likelihood." Immigration and Naturalization Serv., Dep't of Justice, Public Charge: INA Sections 212(A)(4) and 237(A)(5)—Duration of Departure for LPRs and Repayment of Public Benefits (Dec. 16, 1997).

54. Similarly, the State Department issued an internal update in 1998 that IIRIRA did "not change[] the long-standing legal presumption that an able-bodied, employable individual will be able to work upon arrival in the United States" and thus not become a public charge. State Department Cable no. 98-State-102426 (June 8, 1998), *reprinted in* 75 Interpreter Releases 879 (June 29, 1998). The State Department further stated "[t]he presumption that the applicant will find work coupled with the fact that the [affidavit of support] is a legally enforceable contract will provide in most cases a sufficient basis to accept a sponsor's . . . technically sufficient [affidavit] as overcoming the public charge ground." *Id*.

CORE/2052922.0049/154461210.5

55. Although these INS and State Department internal documents recognized that IIRIRA made no changes to the longstanding meaning or interpretation of the term "public charge," by 1999 the INS was concerned that public "confusion about the relationship between the receipt of public benefits and the concept of 'public charge' ha[d] deterred eligible [non-citizens] and their families, including U.S. citizen children, from seeking important health and nutrition benefits that they are legally entitled to receive." Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 FR 28689, 28692 (May 26, 1999) ("1999 Field Guidance").

56. The Field Guidance explained that "[t]his reluctance to access benefits has an adverse impact not just on the potential recipients, but on public health and the general welfare." *Id.* at 28692.

57. At the same time, the INS published a proposed rule for notice and public comment that the uncertainty following the near simultaneous enactment of IIRIRA and PRWORA was "undermining the Government policies of increasing access to health care and helping people to become self-sufficient." Inadmissibility and Deportability on Public Charge Grounds, 64 FR 28676, 28677 (proposed May 26, 1999) ("Public Charge Grounds"). This rule was never issued in final form.

58. These two INS documents each confirmed that the longstanding historic understanding of the term "public charge" remained operative.

59. The Public Charge Grounds confirmed that the term "public charge" meant an individual "who is likely to become . . . primarily dependent on the Government for subsistence, as demonstrated by either the receipt of public cash assistance for income maintenance or institutionalization for long-term care at Government expense." Public Charge Grounds, 64 FR at 28,677.

CORE/2052922.0049/154461210.5

60. The 1999 Field Guidance also aimed to "help alleviate public confusion over the meaning of the term 'public charge' in immigration law and its relationship to the receipt of Federal, State, and local public benefits" and to "provide aliens with better guidance as to the types of public benefits that will and will not be considered in public charge determinations." 1999 Field Guidance, 64 FR at 28689.

61. The 1999 Field Guidance made clear that only receipt of cash assistance for income maintenance (such as Temporary Assistance for Needy Families, Supplemental Security Income, and state equivalents) and publicly funded long-term institutionalization, and not non-cash benefits, would be considered in making the public-charge determination. 1999 Field Guidance, 64 FR at 28693.

62. In explaining the contemporaneous validity of the long standing definition of "public charge," the 1999 Field Guidance recognized that "federal, state, and local benefits are increasingly being made available to families with incomes far above the poverty level, reflecting broad public policy decisions about improving general public health and nutrition, promoting education, and assisting working-poor families in the process of becoming self-sufficient." *Id*. at 28,692.

63. As a corollary, "participation in such noncash programs is not evidence of poverty or dependence" because they "are by their nature supplemental and do not, alone or in combination, provide sufficient resources to support an individual or family." *Id*. By focusing only on cash assistance for income maintenance and long-term institutionalization, the INS could thus "identify those who are primarily dependent on the government for subsistence without inhibiting access to non-cash benefits that serve important public interests." *Id*.

CORE/2052922.0049/154461210.5

64. The focus on cash benefits for making the public charge determination was consistent with the advice provided by federal benefits agencies, including the Department of Health and Human Services, the Department of Agriculture, and the Social Security Administration, that "receipt of cash assistance for income maintenance is the best evidence of primary dependence on the Government" because "non-cash benefits generally provide supplementary support . . . to low-income working families to sustain and improve their ability to remain self-sufficient." Public Charge Grounds, 64 FR at 28677–78.

65. Indeed, the INS could not "conceive of a situation where an individual . . . could support himself or his family solely on non-cash benefits so as to be primarily dependent on the [G]overnment," other than for long-term institutionalization at government expense. *Id*. at 28678.

66. In addition, according to the Public Charge Grounds, "[p]ast receipt of non-cash benefits [*e.g.*, Medicaid, CHIP as well as similar state and local programs] should be excluded from consideration for public charge purposes." *Id*.

67. Congress has expanded immigrants' access to benefits that had been explicitly excluded from the public charge determination without indicating that they should be factored into the determination. In the 2002 Farm Bill, for example, Congress restored eligibility for food stamps (now known as Supplemental Nutritional Assistance Program or "SNAP") to immigrant children, immigrants receiving disability benefits, and adults who had lived in the United States in a "qualified" immigrant status for five years. Farm Security and Rural Investment Act of 2002, Pub L. No. 107-171 (May 13, 2002).

68. As recently as 2018, the Congressional Research Service confirmed that Defendants' position had been consistent and clear:

CORE/2052922.0049/154461210.5

> [P]ublic charge determination[s] for aliens applying for adjustment to [Legal Permanent Residency] status, only consider[s] cash income maintenance benefits and government-funded institutionalization for long-term care. Cash assistance for income maintenance . . . 'includes Supplemental Security Income (SSI), cash assistance from the Temporary Assistance for Needy Families (TANF) program and state or local cash assistance programs for income maintenance, often called "general assistance" programs' . . . . [A]n alien's past or current receipt of these benefits or of government funded long-term care does not automatically lead to a determination of inadmissibility, but instead only factors into the prospective analysis under the totality of the circumstances test.

Congressional Research Service, Immigration: Frequently Asked Questions about "Public Charge" at 7 (Sept. 19, 2018) (*available at* https://fas.org/sgp/crs/homesec/R45313.pdf).

69. Although Congress, DHS, and the State Department have interpreted "public charge" consistently over time, altering the definition of "public charge" has been a clear priority from the early days of the Trump Administration. During the President's first month in office, an executive order reinterpreting the term was leaked to the public, but never issued.[24]

70. In 2017, the Administration endorsed the Reforming American Immigration for Strong Employment ("RAISE") Act that would have eliminated some of the family-based admission preferences created by the 1965 Act and established a point-based system based on factors including age, formal education, English language proficiency, and highly-compensated employment for evaluating potential immigrants. Congress did not pass the RAISE Act. S.B. 354, 115th Cong., 1st sess. (2017).

---

[24] *Read the Trump administration's draft proposal penalizing immigrants who accept almost any public benefit*, Wash. Post., http://apps.washingtonpost.com/g/documents/world/read-the-trump-administrations-draft-proposal-penalizing-immigrants-who-accept-almost-any-public-benefit/2841/.

CORE/2052922.0049/154461210.5

### III. THE PROPOSED RULE REDEFINED THE MEANING OF "PUBLIC CHARGE."

71. On October 10, 2018, DHS published a Notice of Proposed Rulemaking (Proposed Rule) regarding the public charge ground for inadmissibility. 83 FR 51114.

72. The Proposed Rule sought to redefine the meaning of public charge and to significantly change the process by which DHS decides whether an applicant would likely become a public charge and thus be inadmissible.

73. The Proposed Rule abandoned the long-standing understanding of a public charge as a person who was and would remain primarily dependent on the government over the long term. It proposed to impose a new threshold that any applicant who received public benefits valued at more than 15 percent of the Federal Poverty Guideline for a household of one (approximately $5 per day) for a period of 12 consecutive months would be considered a public charge. 83 FR at 51164-65.

74. The Proposed Rule also expanded the benefits to be considered to include non-cash benefits, like food supplements, public health insurance, and housing assistance. *Id.* The Proposed Rule classified subsidies like SNAP and Section 8 housing vouchers as "monetizable benefits" and services like Medicaid as "non-monetizable benefits." If an applicant received both simultaneously, then use of the non-monetizable benefits for only nine months in aggregate within a 36-month period would render the applicant a public charge. *Id.* at 51,158, 51,290.

75. The Proposed Rule also would assign positive, negative, heavily positive, and heavily negative weights to enumerated factors. *Id.* at 51,291-92.

76. DHS acknowledged that the changes to the determination of "public charge" will likely create a chilling effect causing immigrants to take advantage of fewer public benefits for which they

CORE/2052922.0049/154461210.5

are eligible. Inadmissibility on Public Charge Grounds, 83 Fed. Reg. 51,114, 51,266 (Oct. 10, 2018); *Id.* at 51,268 ("There may also be additional reductions in transfer payments from states to individuals who may choose to disenroll from or forego enrollment in a public benefits program.").

77. The Proposed Rule received over 266,000 comments, "the vast majority of which opposed the rule." Public Charge Rule, 84 FR at 41297.

## IV. THE FINAL PUBLIC CHARGE RULE DEPARTS FROM SETTLED LAW DEFINING "PUBLIC CHARGE" TO MEAN PRINCIPAL DEPENDENCE ON FEDERAL GOVERNMENT CASH ASSISTANCE.

78. The final Public Charge Rule changes both the public charge definition and the process by which DHS determines whether an applicant is likely to meet this definition in the future. *See generally* 84 Fed. Reg. at 41297-300 (summary of changes).

79. Despite the longstanding exclusion of supplemental, non-cash benefits from the public charge analysis, the Public Charge Rule creates a new standard for public charge that requires an applicant to show s/he has maintained what is, in effect, something close to total self-sufficiency, a concept which the Public Charge Rule admits is "not codified in the INA itself." 84 FR at 41356.

80. DHS's redefinition of public charge to mean "a person who receives the designated benefits for more than 12 months in the aggregate of any 36-month period," 84 FR at 41357, contravenes Congressional intent, regulatory history, and decades of case law which all rely on the primarily dependent standard that excluded non-cash benefits. Moreover, the predictable consequences of the Public Charge Rule are that immigrant communities will become less healthy, less educated, and less equipped for the workforce, significantly undermining their ability to attain self-sufficiency by supplementing low-paying, full-time

employment with reliance on non-cash public benefits programs that Congress created and extended to immigrants for that very purpose.

81. The Public Charge Rule also fails to acknowledge long-standing agency guidance that immigrants' use of supplemental, non-cash benefits did not raise apprehensions about improper incentives nor was their use considered inimical to achieving self-sufficiency. *See* 1999 Field Guidance, 64 FR at 28692. Further, the Rule proffers *no* evidence that immigrants are motivated by participation in non-cash benefits programs to come or to stay in the United States or that immigrants who use supplemental, non-cash benefits typically became primarily dependent on the government, rather than using those benefits as assistance to become upwardly mobile and more self-sufficient.

82. While the Public Charge Rule projects certain cost advantages for federal and state budgets that allegedly will result from disenrollment or failure to enroll in supplemental, non-cash benefits programs, it fails to account for a wide range of public health, public safety, economic, and administrative cost injuries that Plaintiffs will suffer as a result of disenrollment or foregone participation in those programs by immigrants fearful of losing their status.

## V.    THE PUBLIC CHARGE RULE WAS MOTIVATED BY RACIAL, ETHNIC, NATIONAL ORIGIN AND NATIONALITY ANIMUS.

83. Throughout his campaign and time in office, President Trump has made clear his intent to limit the number of immigrants from Latin American, African, and Asian countries. Most notably, President Trump asked, "Why do we want all these people from 'shithole countries'

coming here?",[25] a remark Senator Lindsey Graham described as "incredibly disappointing."[26] Similarly, Trump has described immigrants from those countries as "infesting" the United States.[27]

84.  President Trump's view on limiting immigration from "shithole countries" is in turn based on his discriminatory belief that immigrants from such countries are poorer and consequently drain taxpayer resources. During a meeting in the Oval Office, President Trump complained that immigrants from Haiti "all have AIDS" and that once immigrants from Nigeria had seen the United States, they would never "go back to their huts."[28] At the same time, President Trump "suggested that the United States should instead bring more people from countries such as Norway," and he was "open" to immigrants from some Asian countries thought to be economically beneficial.[29]

---

[25] Eli Watkins & Abby Phillip, *Trump Decries Immigrants from 'Shithole Countries' Coming to US*, CNN (Jan. 12, 2018), https://www.cnn.com/2018/01/11/politics/immigrants-shithole-countries-trump/index.html.

[26] Emma Dumain, *A Day Later, Lindsey Graham Breaks Public Silence on Trump's 'Shithole' Remarks*, McClatchy (Jan. 12, 2018), https://www.mcclatchydc.com/news/politics-government/congress/article194434204.html.

[27] Donald J. Trump (@realDonaldTrump), Twitter (June 19, 2018, 9:52 AM), https://twitter.com/realDonaldTrump/status/1009071403918864385.

[28] Michael D. Shear & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, N.Y. Times (Dec. 23, 2017), https://www.nytimes.com/2017/12/23/us/politics/trump-immigration.html?_r=0.

[29] Josh Dawsey, *Trump Derides Protections for Immigrants from "Shithole" Countries*, Wash. Post (Jan. 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html?noredirect=on&utm_term=.bd24836c5250.

CORE/2052922.0049/154461210.5

85. President Trump has made no secret of his views that immigrants drain public resources. In 2018, Trump promoted an article titled "Shock report: US paying more for illegal immigrant births than Trump's wall."[30] President Trump has also stated:

- "ObamaCare gives free insurance to illegal immigrants."[31]

- "Your tax dollars well spent. Over 1.295M ObamaCare enrollees will also be illegal immigrants."[32]

- "It's a national embarrassment that an illegal immigrant can walk across the border and receive free health care."[33]

- "We will soon be at a point with our incompetent politicians where we will be treating illegal immigrants better than our veterans."[34]

86. As a candidate and in office, President Trump endorsed significant cuts to legal immigration and challenged the centrality of family reunification to federal immigration policy. The official White House website states that "the President supports ending chain migration, eliminating the Visa Lottery, and moving the country to a merit-based entry system."[35]

87. Shortly after President Trump's inauguration in January 2017, the media obtained a draft of an "Executive Order on Protecting Taxpayer Resources by Ensuring Our Immigration Laws Promote Accountability and Responsibility." The draft Executive Order instructed DHS to

---

[30] Donald J. Trump (@realDonaldTrump), Twitter (Oct. 22, 2018, 1:52 PM), https://twitter.com/realDonaldTrump/status/1054430376557535232.

[31] Donald J. Trump (@realDonaldTrump), Twitter (Feb. 28, 2012, 2:08 PM), https://twitter.com/realDonaldTrump/status/174571702091644928.

[32] Donald J. Trump (@realDonaldTrump), Twitter (July 7, 2014, 3:54 PM), https://twitter.com/realDonaldTrump/status/486236729083719680.

[33] Donald J. Trump (@realDonaldTrump), Twitter (July 18, 2015, 2:16 PM), https://twitter.com/realDonaldTrump/status/622469994220273664.

[34] Donald J. Trump (@realDonaldTrump), Twitter (July 20, 2015, 10:25 AM), https://twitter.com/realDonaldTrump/status/623136748718137344.

[35] White House, Immigration, https://www.whitehouse.gov/issues/ immigration/ (last visited July 27, 2019).

"rescind any field guidance" and "propose for notice and comment a rule that provides standards for determining which aliens are admissible or deportable on public charge grounds," including if a noncitizen receives or is likely to receive non-cash public benefits. The draft Executive Order was never issued.[36]

88.    In 2017, two U.S. senators introduced a bill designed to significantly reduce legal immigration by, for example, curbing the government's long-established policy favoring family reunification. The Reforming American Immigration for a Strong Economy ("RAISE") Act would have given visa preference only to immediate family and eliminated the diversity visa lottery, which allots a limited number of visas to countries with historically low rates of immigration to the United States.[37] It also proposed a "merit-based immigration system," which gives preference to immigrants between the ages of 26 and 30, with doctoral degrees, high English proficiency, and a job offer with a high salary. The RAISE Act would have precluded parents of adult U.S. citizens from applying for Legal Permanent Resident status and, if they entered as temporary nonimmigrants, barred those parents from receiving federal, state, or local public benefit.[38]

89.    President Trump supported the RAISE Act.[39] Explaining his support, President Trump said "The RAISE Act prevents new migrants and new immigrants from collecting welfare . . . .

---

[36] See Memorandum from Andrew Bremberg Regarding Executive Order on Protecting Taxpayer Resources by Ensuring Our Immigration Laws PromoteAccountability and Responsibility (Jan. 23, 2017), https://www.nafsa.org /uploadedFiles/NAFSA_Dojo/Professional_Resources/Browse_by_Interest/International_Students_and_Scholars/DraftEOtaxprograms.pdf.

[37] S.B. 354, 115th Cong., 1st sess. (2017).

[38] Id. § 4(d)(2)(B).

[39] White House, Fact Sheets, President Donald J. Trump Backs RAISE Act, Aug. 2, 2017, https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-backs-raise-act/.

CORE/2052922.0049/154461210.5

They're not going to come in and just immediately go and collect welfare." The White House also asserted falsely that "[m]ore than 50 percent of all immigrant households receive welfare benefits, compared to only 30 percent of native households in the United States that receive welfare benefits."[40] In fact, immigrants are less likely to consume public assistance benefits than native-born Americans and, when they do, they generally consume a lower dollar value of benefits. Overall, immigrants consume 27% fewer benefits on average than native-born Americans with similar incomes and ages.[41]

90.  In June 2017, shortly before announcing his support for the RAISE Act, President Trump received a briefing on immigration from White House senior adviser Stephen Miller. (Miller, an ardent supporter of the Public Charge Rule, had reportedly once told a former White House communications aide, "I would be happy if not a single refugee foot ever touched American soil."[42]) At the briefing, after learning that 15,000 Haitians had received U.S. visas in 2017, President Trump replied that they "all have AIDS." When President Trump learned that 40,000 Nigerians had received visas, he said that they would never "go back to their huts."[43]

91.  Defendant Cuccinelli has expressed similar sentiments. In a 2012 interview, Cuccinelli compared U.S. immigration policy to local laws governing treatment of rats, stating that a District of Columbia law prohibiting killing of rats or separating rat families is "worse than our immigration policy—you can't break up rat families. Or raccoons or all the rest and you

---

[40] *Id.*

[41] Alex Nowrasteh & Robert Orr, *Immigration and the Welfare State* at 1, 7, Cato Institute, May 10, 2018, https://object.cato.org/sites/cato.org/ files/pubs/ pdf/irpb6.pdf.

[42] Cliff Sims, *Team of Vipers: My 500 Extraordinary Days in the Trump White House*, 191 (2019).

[43] Michael D. Shear & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, N.Y. Times, Dec. 23, 2017, https://www.nytimes.com/2017/12/23/us/politics/trump-immigration.html?module=inline.

can't even kill them. It's unbelievable."[44] He later voiced similar sentiments as a public official. In a press conference at the White House announcing issuance of the Public Charge Rule, Defendant Cuccinelli stated that in promulgating "President Trump's public charge inadmissibility rule," the Department was "promoting our shared history" and "implement[ing] . . . a law passed by Congress in 1996 that has not been given meaningful effect."[45]

92. Asked about the 1903 plaque on the Statue of Liberty that invites "your tired, your poor, your huddled masses," Cuccinelli initially stated: "I'm certainly not prepared to take anything down off the Statue of Liberty." He went on to say, that plaque "was referring back to people coming from Europe where they had class-based societies" not to people coming to the United States from outside Europe. He also reinterpreted it to "[g]ive me your tired and your poor who can stand on their own two feet . . . ."[46] When asked if the Rule changes the definition of the American dream, Cuccinelli said, "[n]o one has a right to become an American who isn't born here as an American" and that "it is a privilege to become an American, not a right for anybody who is not already an American citizen."[47] He also said the Rule was "part of President Trump keeping his promises."[48]

---

[44] Latino Voices, *Ken Cuccinelli Protested With Live Rats Over Comments About Immigrants*, Huff. Post. Nov. 5, 2013.

[45] *Cuccinelli on "public charge" immigration rule*, CBS News, Aug. 12, 2019, https://www.cbsnews.com/video/immigration-official-ken-cuccinelli-immigrants-public-charge-rule/.

[46] Rebecca Morin, *Immigration official Ken Cuccinelli: Statue of Liberty poem refers to immigrants from Europe*, USA Today Aug. 13, 2019.

[47] Sasha Ingber and Rachel Martin, *Immigration Chief: 'Give Me Your Tired, Your Poor Who Can Stand On Their Own 2 Feet'*, Nat'l Pub. Radio, Aug. 13, 2019.

[48] *Id.*

CORE/2052922.0049/154461210.5

93. In December 2017, DHS noted in the Unified Agenda of Federal Regulatory and Deregulatory Actions its intent to publish a Notice for Public Rulemaking regarding the public charge ground of inadmissibility. In early 2018, it was widely reported that the new rule would dramatically expand the types of public assistance programs that could be considered in the public charge test, including non-cash benefits like SNAP and Medicaid.[49] In January 2018, the State Department revised the Foreign Affairs Manual ("FAM") to instruct consular officers to consider a wider range of public benefits when determining whether visa applicants who have received or are currently receiving benefits are inadmissible on public charge grounds.[50] As revised, the FAM also allowed State Department officials to consider whether an applicant's family member has received public benefits as part of the public charge test.[51]

94. Visa denials due to public charge inadmissibility have substantially increased since the State Department issued the amended FAM. *See Mayor and City of Baltimore v. Trump*, Case No. ELH-18-3636, 2019 WL 4598011, at *7 (D. Md. Sept. 20, 2019). In the 2018 fiscal year, more than 13,000 visas applications were denied on public charge grounds, whereas just 897 visa applications were denied on public charge grounds in 2015. *Id.*

---

[49] *See, e.g.,* Nick Miroff, *Trump proposal would penalize immigrants who use tax credits and other benefits*, Wash. Post. Mar. 28, 2018, https:// www.washingtonpost.com/world/national-security/trump-proposal-would-pen alize-immigrants-who-use-tax-credits-and-other-benefits/2018/03/28/4c6392e0-2924-11e8-bc72-077aa4dab9ef_story.html?noredirect=on&utm_term=.e291852 f1728; Yeganeh Torbati, Exclusive: Trump administration may target immigrants who use food aid, other benefits, Reuters, Feb. 8, 2018, https://www.reuters.com/article/us-usa-immigration-services-exclusive/exclusive-trump-administration-may-target-immigrants-who-use-food-aid-other -benefits-idUSKBN1FS2ZK.

[50] U.S. Dep't of State, "Public Charge" Update to 9 FAM 302.8 (Jan. 4, 2018), https://fam.state.gov/fam/09FAM/09FAM030208.html#M302_8.

[51] *Id.* at 302.8-2(B)(2)(f)(2)(b)(i).

CORE/2052922.0049/154461210.5

95.    In January 2018, President Trump rejected a bipartisan immigration proposal by members of Congress. In reference to the deal's protections for immigrants from Haiti and Africa, President Trump asked why he should accept immigrants from "shithole countries" rather than from nations like "Norway."[52]

96.    During the spring of 2018, President Trump said in a meeting at the White House that the United States has "the dumbest laws on immigration in the world" and exhorted his administration officials to "do much better" in keeping out undesirable immigrants. "You wouldn't believe how bad these people are," President Trump said. "These aren't people, these are animals . . . ."[53]

97.    In June 2018, Miller emailed then-USCIS Director L. Francis Cissna regarding DHS's public charge rule. Miller wrote, "Francis – The timeline on public charge is unacceptable." Miller continued, "I don't care what you need to do to finish it on time." Miller also wrote, "It's an embarrassment that we've been here for 18 months and USCIS hasn't published a single major reg."[54]

---

[52] Julie Hirschfeld Davis, Sheryl Gay Stolberg & Thomas Kaplan, *Trump Alarms Lawmakers With Disparaging Words for Haiti and Africa*, N.Y. Times, Jan. 11, 2018, https://www.nytimes.com/2018/01/11/us/politics/trump-shithole-countries.html.

[53] Julie Hirschfeld Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. Times, May 16, 2018, https://www.nytimes.com/ 2018/05/16/us/politics/trump-undocumented-immigrants-animals.html.

[54] Ted Hesson, *Emails show Miller pressed hard to limit green cards*, Politico, Aug. 2, 2019, available at https://subscriber.politicopro.com/ article/2019/08/emails-show-miller-pressed-hard-to-limit-green-cards-1630406.

CORE/2052922.0049/154461210.5

98. In the same month, President Trump tweeted that immigrants are "invad[ing]" and "infest[ing]" the United States.[55] Of other countries, President Trump said at a rally that same month, "They're not sending their finest. We're sending them the hell back."[56]

99. At a political campaign event in Arizona in October 2018, President Trump referred to Latin American immigrants as "bad hombres."[57]

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF APA § 706(2)(A)–ARBITRARY AND CAPRICIOUS– INADEQUATELY JUSTIFIED

100. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

101. The APA provides that courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).An agency action is arbitrary and capricious where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile*

---

[55] Donald J. Trump (@realDonaldTrump), Twitter (June 24, 2018, 8:02 AM), https://twitter.com/realdonaldtrump/status/1010900865602019329; Donald J. Trump (@realDonaldTrump), Twitter (June 19, 2018, 9:52 AM), https://twitter.com/realDonaldTrump/status/1009071403918864385.97 Exec. Order 12,866, § 3(f).

[56] Katie Rogers & Jonathan Martin, *'We're Sending Them the Hell Back,' Trump Says of Securing the Country's Borders*, N.Y. Times, June 20, 2018, https://www.nytimes.com/2018/06/20/us/politics/trump-minnesota-rally.html.

[57] Christopher Cadelago and Brent D. Griffiths, *Still hopeful of keeping House, Trump torches Democrats in the Desert*, Politico (Oct. 20, 2018).

CORE/2052922.0049/154461210.5

*Ins. Co.*, 463 U.S. 26, 43 (1983). And "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *Id*. at 42.

102. DHS failed to cite evidence or to provide substantive reasons to abandon the federal government's over 100-year-old definition of public charge--as published in agency guidance documents since 1999—to mean dependence on subsistence cash benefits.

103. As to the longstanding nature of DHS's prior policy, DHS recognizes, "the prevailing approach to public charge inadmissibility has been dictated" for decades by the 1999 Field Guidance. 84 FR at 41294. Under that Guidance, DHS acknowledges non-cash benefits have not been be factored into public charge determinations:

> an alien's reliance on or receipt of non-cash benefits such as the Supplemental Nutrition Assistance Program (SNAP), or food stamps; Medicaid; and housing vouchers and other housing subsidies are not currently considered by DHS in determining whether an alien is deemed likely at any time to become a public charge.

84 FR at 41295.

104. DHS justifies the change from the longstanding Guidance definition on the basis that receipt of "non-cash benefits for basic living needs such as food and nutrition, housing, and healthcare, that account for significant public expenditures . . . for more than 12 months within any 36-month period is sufficient to render a person a public charge. 84 FR at 41349; *see* Proposed Rule, 83 FR at 51164 (same). This, DHS now asserts, is because "an individual with limited means to satisfy basic living needs who uses government assistance to fulfill such needs for that duration of time relies on such assistance to such an extent that the person is not self-sufficient." *Id.*

105. This assertion, however, is contrary to longstanding agency policy and is asserted without any evidence of a change of the facts on the ground. Under the 1999 Field Guidance, the INS

CORE/2052922.0049/154461210.5

could not "conceive of a situation where an individual . . . could support himself or his family solely on non-cash benefits so as to be primarily dependent on the [G]overnment," other than for long-term institutionalization at government expense. Public Charge Grounds, 64 FR at 28677–78.

106. "[A]n agency's decision to change course may be arbitrary and capricious if the agency ignores or countermands its earlier factual findings without reasoned explanation for doing so. An agency cannot simply disregard contrary or inconvenient factual determinations that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank slate." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 557 (2009) (Kennedy, J., concurring); *accord Organized Village of Kake v. Dept. of Agriculture*, 795 F.3d 956, 969 (9th Cir. 2015) (en banc) (an agency's change in policy when there has been no demonstrated change in the underlying facts, but only a change in the Administration, is arbitrary and capricious).

107. In its Proposed Rule, DHS proposed a threshold for a public charge determination to be receipt of "monetizable [non-cash] public benefits . . . [whose] cumulative value . . . exceeds 15 percent of the Federal Poverty Guidelines (FPG) for a household of one" for twelve consecutive months, which translates to "$1,821 worth of monetizable public benefits." 69 FR at 51164. In other words, an individual that received $1,822 or more in 2018 would be considered to be dependent on the government for subsistence. *See id.* at 51165 ("DHS believes that an individual who receive monetizable public benefits in excess of 15 percent of FPG is neither self-sufficient nor on the road to achieving self-sufficiency.").

108. Many commenters pointed out the obvious: that, consistent with the 1999 Field Guidance's finding that non-cash benefits are supplemental, the $1,822 threshold can hardly be

considered in 2018, especially in areas with a higher cost of living, a reasonable measure of dependence on the government or as indicative of a lack of self-sufficiency. Other commenters pointed to studies that support the continued validity of the 1999 conclusion that non-cash public benefits are supplemental by showing that receipt of them amounted to 10 percent or less of annual income for otherwise self-sufficient individuals or families. *See generally* Public Charge Rule, 84 FR at 41357-58.

109. Rather than confront these showings head-on, the Public Charge Rule abandons the 15 percent threshold in favor of "a single duration-based threshold" based on "current receipt or past receipt of more than 12 months of public benefits, in the aggregate, in any 36-month period . . . will be considered a heavily weighted negative factor in the totality of the alien's circumstances." *Id*. at 41358. This change cannot hide the fact that DHS also abandoned the 15 percent FPG threshold in favor of *no* threshold for non-cash public benefits to be considered a heavily weighted negative factor in the public charge determination. *See id*. ("DHS will consider in the totality whether an alien has applied for, received, or been certified or approved to receive *any* public benefits . . . in assessing whether he or she is likely to become a public charge") (emphasis added).

110. DHS also failed to consider the disruption of significant reliance interests the changed definition will cause, more specifically, the reliance of Plaintiffs in developing government assistance programs and allocating their resources, on the ability of immigrants in their employ or whom they serve to utilize non-cash benefits to which they are lawfully entitled. A failure to even acknowledge, much less take reliance interests into account when changing a rule or policy is a form of arbitrary agency action. *FCC v. Fox Television Stations, Inc*., 556 US 502, 515 (2009).

CORE/2052922.0049/154461210.5

## COUNT II
## VIOLATION OF APA § 706(2)(A)—ARBITRARY AND CAPRICIOUS—PATENTLY INADEQUATE COST BENEFIT ANALYSIS

111.  Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

112.  The costs and benefits of agency action are "a centrally relevant factor when deciding whether to regulate." *Michigan v. EPA*, 103 S. Ct. 2699, 2707 (2015). In this regard, cost "includes more than the expenses of complying with the regulations, any disadvantage could be termed a cost . . . including, for instance, harms that regulation might do to human health or the environment." *Id.* Judicial review of agency action must evaluate the agency's cost analysis because "reasonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decisions." *Id.*

113.  The Public Charge Rule expressly acknowledges that its costs and benefits are matters to be considered in evaluating the reasonableness of the proposed changes. *See generally* 84 FR at 41300-03 & Table 1 ("Summary of Costs and Benefits"); *see also id.* at 41485-90 & Tables 2 and 8 (same). DHS states that the primary cost advantage of the rule change is "a reduction in transfer payments from the Federal Government to individuals who may choose to disenroll from or forego enrollment in a public benefits program . . . [which] DHS estimates . . . will be approximately $2.47 billion annually." *Id.* at 41485; *see id.* at 41300-01 (same).[58]

114.  As to the cost disadvantages, the Public Charge Rule projects several costs related to the additional information collection required under the Rule that would amount in aggregate to

_____

[58] While DHS suggests that these amounts "account for significant federal expenditures, 84 FR at 41296, $2.47 billion represents 0.05% of the proposed 2020 federal budget of $4.7 trillion.

CORE/2052922.0049/154461210.5

at least $570 million annually. 84 FR at 41497-500 (listing total annual cost burden associated with several different forms required under the new rule). The Rule does *not*, however, provide estimates of what are likely to be the more significant and serious cost burdens of the Public Charge Rule. With regard to the cost disadvantages to affected individuals, "DHS has determined that the rule may decrease disposable income and increase the poverty of certain families and children, including U.S. citizen children," 84 FR at 41493. DHS does not make any effort to quantify this cost, but merely states its "opinion that the benefits of the action justify the financial impact on the family." *Id*.

115. Likewise, "DHS recognizes that reductions in federal and state transfers under federal benefit programs may have impacts on state and local economies, large and small businesses, and individuals. For example, the rule might result in reduced revenues for healthcare providers participating in Medicaid, companies that manufacture medical supplies or pharmaceuticals, grocery retailers participating in SNAP, agricultural producers who grow foods that are eligible for purchase using SNAP benefits, or landlords participating in federally funded housing programs." 84 FR at 41301; *see id*. at 41486 (same). Despite this recognition, DHS made no effort to quantify these adverse impacts.

116. Aside from these recognized, but unquantified, costs, DHS completely ignored the high costs to states and local governments, and other organizations as immigrants and their families withdraw from or forego public benefits programs. Health insurance is one public benefit from which individuals and families are likely to withdraw. Without coverage, these individuals and families are likely to put off health care until an emergency arises, thus likely leading to more complex and costly health problems and an increased use emergency room care services. In addition as members of the community forgo health care, including

immunizations, the spread of contagious diseases will increase, imposing additional costs on state and local governments.

117. Without health insurance to pay the higher costs related to those outcomes, states and other will have to bear an increase in uncompensated care costs. *See* 84 FR at 41384 ("there is a potential for increases in uncompensated care in which a treatment or service is not paid for by an insurer or patient"); *id.* ("DHS does not have specific estimates on the increase[d] cost for [uncompensated care] services."). For example, Maryland, as a result of increasing the number of persons who were covered by health insurance, saw a drop of approximately $311 million in uncompensated care costs from 2013 to 2015. This decline would be reversed as individuals and families disenroll or forego enrollment in health insurance benefits as a result of the Rule. Similar results would likely occur in a large number of other states, such that in aggregate the nation-wide cost disadvantage from reduced enrollment in the health insurance public benefit would largely diminish, if not completely offset, the $2.47 billion benefit estimated in the Rule. 84 FR at 41485. A similar, albeit smaller, burden will be placed on private organizations that provide health care services to uninsured, and should also be considered as a cost disadvantage of the Rule.

118. Aside from health costs, implementation of the Rule would also put a greater strain on state and local governments and private organizations to offset the lost federal food security and housing assistance benefits that will result from disenrollment or non-enrollment. Yet, DHS made no effort to quantify these costs either. Without such quantification, it is impossible to determine if the Rule "does significantly more harm than good." *Michigan v. EPA*, 135 S. Ct. at 2707. It follows that DHS "entirely failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, and thus its action is arbitrary and capricious. *E.g., Sierra Club*

CORE/2052922.0049/154461210.5

*v. Dept. of Interior*, 899 F.3d 260, 294 (4th Cir. 2018) ("agency action was arbitrary and capricious when 'it evidences a complete failure to reasonably reflect upon the information contained in the record and grapple with contrary evidence'") (citation omitted).

119. While DHS acknowledged that the Public Charge Rule is intended to "minimize the incentive of aliens to immigrate," i.e, to reduce the number of immigrants in the United States, 84 FR at 41309,[59] it completely failed to acknowledge the cost to employers who rely on immigrant workers, and members of the public who rely on their services. The harm to nursing homes and other home health care providers is particularly significant. As noted in the "Parties" section of this Complaint, about one-quarter of the nation's 4 million direct care workers are immigrants, 43% of whom access some public benefits."[60] Two thirds of these individuals "receive Medicaid and more than half get food and nutrition assistance." And, while the

---

[59] There has already been well-reported increase in the number of visa denials on public charge grounds under the State Department's similar change to its definition of "public charge." Lindsay Gray, *Keeping Families Apart: Trump's Update to the Public Charge Provision*, Whitlock & Gray Immigration Law Blog (May 24, 2018) [hereinafter Gray, *Keeping Families Apart*], http://www.whitlockgray.com/2018/05/24/public-charge/; Arelis R. Hernández, *A Mexican Businesswoman Went to Visit Her Parents in Maryland. Border Agents Confiscated Her Visa*, Wash. Post (Aug 14, 2018), https://www.washingtonpost.com/local/social-issues/a-mexican-business-executive-went-to-visit-her-parents-in-md-border-agents-confiscated-her-visa/2018/08/14/321c4136-9cc7-11e8-843b-36e177f3081c_story.html ("The American Immigration Lawyers Association says it has seen a spike since April in visa application denials citing public-charge grounds at the U.S. Consulate in Juarez, Mexico."). And, more recently, the government has announced that it "will cap the number of refugees allowed into the U.S. at 18,000 for the fiscal year beginning in October, a record low, and allow states and cities to opt out of accepting refugees.." Michelle Hackman and Andrew Restuccia, *Trump Administration to Reduce Cap on Refugees Allowed Into U.S. to Record-Low 18,000* (September 26, 2019), https://www.wsj.com/articles/trump-administration-to-reduce-cap-on-refugees-allowed-into-u-s-to-record-low-18-000-11569533121.

[60] Howard Gleckman, *How Frail Elders will Pay For Trump's New Anti-Immigrant Rules*, https://www.forbes.com/sites/howardgleckman/2019/08/12/how-frail-elders-will-pay-for-trumps-new-anti-immigrant-rules/#3ddaa04d5b44.

CORE/2052922.0049/154461210.5

Public Charge Rule does not apply to current green card holders, it "effectively will end the pipeline for new workers in an industry with notoriously high turnover."[61]

120. In contrast to the significant costs that the agency ignored, it makes only a conclusory statement about what it claims is its main benefit. DHS states: "The primary benefit of the final rule would be to better ensure that aliens . . . will be self-sufficient, i.e., will rely on their own financial resources, as well as the financial resources of the family, sponsors, and private organizations." 84 FR at 41301. As noted below in Count III, however, DHS provided scant evidence that lack of self-sufficiency among immigrants is a serious problem, and indeed the evidence of the U.S. Census Bureau and many commenters is that immigrants are more likely than native born to be fully employed. *See* ¶ 127, *infra.* Instead of acknowledging this fact, DHS instead claims, "DHS is under no obligation to demonstrate that all or most aliens in the United States are not self-sufficient." 84 FR. at 41306.

## COUNT III
## VIOLATION OF APA § 706(2)(A)—ARBITRARY AND CAPRICIOUS—COUNTER TO THE EVIDENCE

121. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

122. The Public Charge Rule is arbitrary and capricious because Defendants' justification for its promulgation runs counter to the evidence before the agency, relies on factors Congress did not intend the agency to consider, and disregards material facts and evidence, including the U.S. Census Bureau's own studies predicting that without immigration the burden on taxpayers will increase.

---

[61] *Id.*

CORE/2052922.0049/154461210.5

123. Defendants' stated objective in revising the Public Charge rule includes "minimiz[ing] the incentive of aliens to immigrate to the United States because of the availability of public benefits and . . . promot[ing] self-sufficiency of aliens within the United States." 84 FR at 41309.

124. There is ample basis to conclude that the Public Charge Rule will achieve its stated objective of reducing immigration levels. Judge Hollander, for example, recently took judicial notice that this has been precisely the effect of the State Department's similar change to its definition of public charge:

> [V]isa denials due to public charge inadmissibility have surged since the State Department issued the amended [Foreign Affairs Manual to expand the definition of public charge.] In 2015, the State Department denied 897 visa applications on public charge grounds. . . . In contrast, during the 2018 fiscal year, the number of visa applications denied on public charge grounds exceeded 13,000 visa applications. U.S. Dep't of State, Ann. Rep. Table XX (2018).

*Mayor and City Council of Baltimore v. Trump*, No. 1:18 cv 3636, 2019 WL 4598011, at *7 (September 20, 2019) (internal citations omitted).

125. As DHS acknowledges, "to sustain a public charge inadmissibility finding, there must be evidence of a fact that tends to show that the burden of supporting the alien is likely to be cast upon the public." *Id*. at 41351 (citing *Ex parte Hosaye Skaguchi*, 277 F. 913, 916 (9th Cir. 1922). Such evidence, as DHS acknowledged the Proposed Rule, involves "more than a showing of a possibility that the alien will require public support." 83 FR at 51125 (quoting *Matter of Martinez-Lopez*, 10 I&N Dec. 409, 421–23 (BIA 1962)).

126. DHS never addresses, however, whether, if, as DHS anticipates, the Rule reduces immigration levels, the result would be to increase, rather than decrease the burden "cast upon the public," more specifically, the burden on a shrinking number of taxpayers. With an aging native-born population dependent on fewer wage earners to support existing

entitlement programs, statistical data shows that the United States increasingly relies on immigrants to grow the workforce. Far from reducing the burden "cast on the public," the agency's broader definition of public charge will increase the number of able-bodied immigrants who will be labeled "public charges," but who, if granted permanent legal status, would likely help to *reduce* the burden on taxpayers.

127. The evidence before DHS demonstrates that critical demographic trends in the United States will make it less, not more, likely that categorizing immigrant applicants under the agency's overly broad definition of "public charge" will result in actual benefits to the public. As evidence before the DHS documents:

> Last year, the total number of births in the United States fell to its lowest level in 30 years. The general fertility rate dropped to the lowest rate since the United States Centre for Disease Control started keeping records in 1909: to 60.3 births per 1,000 women aged between 15 and 44. The total fertility rate, meanwhile, which estimates the average number of children a woman could expect to have over her lifetime at current birth rates for each age, at 1.76 births per woman, is below the "replacement rate" for fertility. That is the level that keeps populations stable (about 2.1 children per woman). And it is a considerable drop from a decade earlier, when the rate was 2.12 births per woman.[62]

128. These same observations are reflected in the Census Bureau's 2017 population projections.[63] As the Census Bureau's report shows, the only possibility for an increase in the nation's workforce population in coming years (necessary to support the aging population who will rely on social security, Medicare, Medicaid, etc.) is through more, not less, immigration:

> The year 2030 marks a demographic turning point for the United States. Beginning that year, all baby boomers will be older than 65. This will expand the size of the

---

[62] C.K. *America's Fertility Rate Continues Its Deep Decline*, The Economist (Oct. 31, 2018), *available at* https://www.economist.com/democracy-in-america/2018/10/31/americas-fertility-rate-continues-its-deep-decline.

[63] Jonathan Vespa et al., *Demographic Turning Points for the United States: Population Projections for 2020 to 2060*, P25-1144, U.S. Census Bureau (Mar. 2018), *available at* https://www.census.gov/content/dam/Census/library/publications/2018/demo/P25_1144.pdf (hereinafter "2017 Census Bureau Report").

CORE/2052922.0049/154461210.5

older population so that one in every five Americans is projected to be retirement age. Later that decade, by 2035, we project that older adults will outnumber children for the first time in U.S. history. The year 2030 marks another demographic first for the United States. Beginning that year, because of population aging, immigration is projected to overtake natural increase (the excess of births over deaths) as the primary driver of population growth for the country. As the population ages, the number of deaths is projected to rise substantially, which will slow the country's natural growth. As a result, net international migration is projected to overtake natural increase, even as levels of migration are projected to remain relatively flat. These three demographic mile-stones are expected to make the 2030s a transformative decade for the U.S. population.

2017 Census Bureau Report at 1.

129. The fertility rate among native born Americans is currently insufficient to maintain current population. As the 2017 Census Bureau Report also notes: "Over the course of their life, foreign-born women have historically had slightly more children than native-born women (2.2 births compared with 1.9 births on average, respectively)." *Id*. at 3. And because "the foreign born are *more* likely to be in the labor force" than native-born people, *id.* at 11, these demographic changes suggest that immigrants are vital contributors to our economy and not burdens.

130. The 2017 Census Bureau Report observes that the projected net growth in population fueled by immigration distinguishes the United States from other economically stagnating developed nations who are also faced with an overall decline in their native-born populations.[64] One disadvantage of the growing percentage of older Americans will be an increased burden on those working in the United States to fund the programs that benefit an older population. *See id.* at 5 ("In coming decades, the United States is expected to shift from a youth-dependent population toward an elderly-dependent population.").

---

[64] *Id*. at 12 ("This continued growth sets the United States apart from other developed countries, whose populations are expected to barely increase or actually contract in coming decades.").

CORE/2052922.0049/154461210.5

131. In November 2018, Jay Powell, Chairman of the Federal Reserve, made a similar observation: reducing the number of legal immigrants coming to the United States would retard economic growth by placing constraints on the ability of businesses to expand their operations.[65]

132. Yet immigration policy changes by DHS are already reducing the level of legal immigration, despite this being a time "when there are more job openings than job seekers in the United States."[66] "[N]ewly released government data show that during 2018, the Trump Administration was denying applications submitted to the United States Citizenship and Immigration Services at a rate 37 percent higher than the Obama administration did in 2016."[67] A Cato Institute study in fact shows that the DHS 11.3% rejection rate for "work permits, travel documents and status applications, based on family reunification, employment and other grounds . . . is the highest rate of denial on record."[68]

---

[65] Craig Torres, *Fed's Powell Says Reduced Immigration Could Slow U.S. Economy*, Bloomberg News (November 1, 2018), *available at* https://www.bloomberg.com/news/articles/2018-11-01/fed-s-powell-says-reduced-immigration-could-slow-u-s-economy ("Thus, from an economic growth standpoint, reduced immigration would result in lower population growth and thus, all else equal, slower trend economic growth.").

[66] *Id. See also Even in a Solid Economy, U.s. fertility rate is falling*, The Economist (Nov. 26, 2018), reprinted in the Minneapolis Star Tribune, http://www.startribune.com/what-s-causing-the-baby-bust-in-the-u-s/501260312/.

[67] David J. Bier, *America Is Rejecting More Legal Immigrants Than Ever Before*, NewYork Times (November 15, 2018), *available at* https://www.nytimes.com/2018/11/15/opinion/trump-legal-immigrants-reject.html?rref=collection%2Fsectioncollection%2Fopinion&action=click&contentCollection=opinion&region=rank&module=package&version=highlights&contentPlacement=4&pgtype=sectionfront (citing Data Set: All USCIS Application and Petition Form Types, U.S. Citizenship & Immig. Servs., https://www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-all-uscis-application-and-petition-form-types (last updated Oct. 30, 2018).

[68] *Id.* (citing David Bier, *Immigration Application Denial Rates Jump 37% Under Trump*, Cato Institute (Nov. 5, 2018), *available at* https://www.cato.org/blog/immigration-application-denials-jump-37-percent-under-trump).

CORE/2052922.0049/154461210.5

133. Adopting the Public Charge Rule whose purpose is to reduce the number of immigrants who could qualify for permanent status, simply damages employers and reduces tax revenues in both the short and long term future. It will add to the burden on existing wage earners by artificially reducing the size of the workforce who could pay taxes to support the aging population. Thus, far from providing a benefit to the public, the Public Charge Rule would exacerbate the burden on taxpayers.

134. DHS's only acknowledgment of this body of evidence was its statement that "[o]ne commenter stated that the rule would reduce immigration and hurt the country's economic future given the need for immigrant workers to replenish an increasingly aging population." 84 FR at 41472. The agency, however, provided no substantive response, saying only that "[b]eyond the indirect costs and other economic effects described in the economic analysis of this rule, DHS is unable to determine the effect this rule will have on every economic entity mentioned or all aspects of future economic growth." *Id*.

135. Defendants' assertion that DHS is unable to specify the effect on "every economic entity or all aspects of future economic growth" improperly focuses on the trees, while ignoring the forest; namely, that, as the Census Bureau found, with declining birthrates and workforce stagnation, legal immigration levels must increase to sustain current economic growth. Thus, the Rule never addresses, quantitatively or qualitatively, whether its stated aim of reducing immigration would increase, rather than decrease, the "burden cast upon the public," *i.e.*, the burden cast upon a shrinking number of taxpayers.

136. Where, as here, "a party seeks review of agency action under the APA (Administrative Procedure Act [before a district court], the district judge sits as an appellate tribunal. The `entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d

1077, 1083 (D.C. Cir. 2001). And, in such cases, where a party raises serious, material arguments, [i]t most emphatically remains the duty of [the reviewing] court to ensure that an agency engage the arguments raised before it - that it conduct a process of "reason" decision-making." *NorAm Gas Transmission Company v. FERC*, 148 F.3d 1158, 1165 (D.C. Cir. 1990). As the Fourth Circuit has stated: "during notice and comment proceedings, the agency is obligated to identify and respond to relevant, significant issues raised during those proceedings." *North Carolina Growers' Ass'n, Inc. v. United Farm Workers*, 702 F. 3d 755, 769 (4th Cir. 2012). The Public Charge Rule is arbitrary because it fails to address evidence that the Rule would be economically harmful.

## COUNT IV
### VIOLATION OF APA § 706(2)(A)—ARBITRARY AND CAPRICIOUS— FAILURE TO MEANINGFULLY ADDRESS COMMENTS THAT CREDIT REPORTS ARE NOT A RELIABLE BASIS FOR DETERMINING SELF-RELIANCE OF IMMIGRANTS

137. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

138. To avoid acting arbitrarily under the Administrative Procedure Act an agency much give reasoned consideration to material comments and arguments presented. *NorAm Gas Transmission Co. v. FERC*, 148 F.2d 1158, 1165 (D. C. Cir. 1990).

139. DHS acted arbitrarily in failing to address meaningfully the "many comment[]s" 84 FR at 41425, that credit reports are not a reliable basis for determining an immigrant's present or future self-reliance. Yet, the Public Charge Rule's negative factors include whether an applicant has a poor credit score. 84 FR at 41,502-04.

140. Commenters noted that credit scores are especially poor indicators of whether an immigrant is likely to become a public charge, because credit scores do not reflect the subject's history of paying rent, utilities, income, savings or other financial resources. Credit scores are

designed to measure the likelihood that a borrower will make a payment ninety or more days late on a credit obligation. Recent immigrants are unlikely to have access to credit and are thus unable to demonstrate a positive payment history. A credit score or report does not predict an immigrant's long-term financial stability. *See generally* 84 FR at 41426-28.

141. Credit scores and reports may also be inaccurate.[69] For example, according to a Federal Trade Commission study, twenty-six percent of participants noted at least one potentially material error on at least one of their three credit reports.[70] Thirteen percent of the consumers' credit scores increased as a result of modifying an error.[71] Errors in credit reports might be due to mismatched records, balance errors, data management errors, and incorrect reporting of account status, among others.[72] In addition, identity theft might inaccurately and inappropriately affect an individual's credit score.

142. DHS downplays the failure of credit scores to portray accurately an individual's ability to become self-sufficient. The agency relies on vague generalities as to what a "good" or "poor" credit score might mean. 84 FR at 41428 ("A 'good' credit report is generally near or slightly above the average of U.S. consumers, and therefore the person may be self-sufficient and less likely to become a public charge. A poor credit report is well below the average of U.S.

---

[69] Comments of Tzedek DC, DHS Docket No. USCIS-2010-0012, RIN 1615-AA22 (filed Dec. 10, 2018).

[70] Federal Trade Comm'n, Report to Congress Under Section 319 of the Fair and Accurate Credit Transactions Act of 2003 (Dec. 2012), https://www.ftc.gov/sites/default/files/documents/reports/section-319-fair-and-accurate-credittransactions-act-2003-fifth-interim-federal-trade-commission/130211factareport.pdf.

[71] *Id.*

[72] *What are Common Credit Report Errors That I Should Look for on My Credit Report?*, Consumer Fin. Prot. Bureau (June 8, 2017), https://www.consumerfinance.gov/ask-cfpb/what-are-common-credit-report-errors-that-ishould-look-for-on-my-credit-report-en-313/.

CORE/2052922.0049/154461210.5

consumers.") (footnote omitted). But DHS makes no effort and presents no evidence to link immigrants' poor credit scores to long term dependency.

## COUNT V
## VIOLATION OF APA § 706(2)(D)–WITHOUT OBSERVANCE OF
## PROCEDURE REQUIRED BY LAW

143. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

144. The APA imposes two duties on an agency conducting a rulemaking: the notice must specify "either the terms or substance of the proposed rule or description of the subjects and issues involved," and parties must be given "an opportunity to participate in the rulemaking through submission of written data, views, or arguments." 5 U.S.C. §§ 553(b) and (c). "The Courts of Appeals have generally interpreted this to mean that the final rule the agency adopts must be "a 'logical out-growth' of the rule proposed." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007). The Court of Appeals for the Fourth Circuit has interpreted these provisions to mean that "[a]lthough an agency, in its notice of proposed rulemaking, need not identify precisely every potential regulatory change, the notice must be sufficiently descriptive to provide interested parties with a fair opportunity to comment and to participate in the rulemaking." *Chocolate Mfrs. Ass'n v. Block*, 755 F.2d 1098, 1104 (4th Cir. 1985) (citations omitted).

145. Here, the Proposed Rule suggested a shift from the 1999 Field Guidance's criterion of "primarily dependent" on public benefits as the threshold for determining public charge to a threshold criterion based on "receipt of monetizable public benefits . . . [whose] cumulative value . . . exceeds 15 percent of the Federal Poverty Guidelines (FPG) for a household of one within any period of 12 consecutive months." 83 FR at 51164. Based on 2018 data, the

proposed threshold "would exclude up to $1,821 worth of monetizable public benefits for a household of one" from consideration in the public charge determination. *Id.*

146. The Proposed Rule justified the 15 percent quantity of benefits threshold stating it "would not lead to unintended consequences, as could be the case if there was no threshold or the threshold was much smaller." 83 FR at 51165. This threshold also "recognizes that individuals may receive public benefits in relatively small amounts to supplement their ability to meet their needs and the needs of their household without seriously calling into question their self-sufficiency." *Id.*

147. With one exception in the comments which asserted 15 percent was "an acceptable proxy," all comments uniformly argued that the 15 percent was *too low* an amount of benefits. *See* Public Charge Rule, 84 FR at 41357-58 ("many commenters voiced general opposition to the 15 percent threshold;" "commenters asserted that the standard should be 50 percent of the FPG;" "the proposed threshold was so low that it would be more of an indicator that the alien is subject to the inherent uncertainties and exigencies of life . . . [than] an indicator of the alien's ongoing dependence on public benefits").

148. Rather than adopt the 15 percent threshold or respond to the overwhelming view of the comments and adopt a larger threshold, DHS abandoned the quantity of benefits threshold altogether and adopted instead an entirely new "single duration-based threshold" in the final Public Charge Rule: "under this final rule, DHS will consider an alien likely to become a public charge at any time in the future if the alien is more likely than not to receive public benefits for longer than 12 months in the aggregate in any 36-month period." *Id.* at 41358.

149. Another significant change from the Proposed Rule to the final Public Charge Rule is its more severe way to calculate how long a person has received public benefits, thereby drastically

CORE/2052922.0049/154461210.5

reducing the benefits a person could use without incurring a negative factor in the public charge calculus. The final Rule restricts receipt of benefits to "12 months **in the aggregate**," means "for instance, receipt of two public benefits in one month counts as two months." *Id.* at 41297 (emphasis added). Put another way, if an applicant for permanent residence status temporarily took three non-cash public benefits—food, housing and medical assistance—*for a period as short as four months* within any 36-month period, that applicant would be treated as if he or she had been taking public assistance for 12 months. And DHS, in turn, will treat this as a heavily-weighted negative factor in assessing whether the applicant would be likely to become a public charge. Under the Proposed Rule, that same person could have relied upon all three forms of assistance for 11 months and not incurred a negative factor for immigration purposes.

150. The Public Charge Rule's aggregation approach is the opposite of what had been proposed; the Proposed Rule had rejected a no quantity threshold approach because it could lead immigrants to be excluded as "public charges" after they had received "relatively small amounts to supplement their ability to meet their needs and the needs of their household [which do not] seriously call[] into question their self-sufficiency." 83 FR at 51165. Aggregating time periods has the same "unintended consequences" of making people excludable based on receipt of even smaller amounts and duration of benefits than the Proposed Rule had allowed. The final Public Charge Rule thus did exactly what the Proposed Rule had assured the public it would not do. *Id.*

151. In cases where "a final rule reaches a conclusion exactly opposite to that proposed," a reviewing court is "not constrained by the same degree of deference [a court] must afford most agency determinations." *Chocolate Mfrs. Ass'n*, 755 F.2d at 1103. Under the APA's

notice requirements, 5 U.S.C. § 553, an agency "does not have carte blanche to establish a rule contrary to its original proposal;" rather, "the notice must be sufficiently descriptive to provide interested parties with a fair opportunity to comment and to participate in the rulemaking." *Id*. at 1104 (citations omitted).

152. To determine if a notice is sufficiently descriptive of the rule finally adopted, courts have "noted the absence of comments from groups which could be expected to oppose downgrading the performance criteria." *Id*. at 1105; *see, e.g.*, *Sprint Corp. v. FCC*, 315 F.3d 369, 376 (D.C. Cir. 2003) (because parties "did not appreciate that the [agency] was contemplating" a particular point, "the commenters understandably submitted no comments on this point"). Here, *no* comments suggested a downgrading from a 15 percent to a smaller threshold for use of benefits, only one comment supported 15 percent, and all others supported a quantity threshold above the proposed 15 percent limit. 84 FR at 41357-58. It can be reasonably inferred that the latter group of commenters would have opposed lowering the amount of benefits a person could use by eliminating the quantity threshold and switching instead solely to a duration threshold in which benefit periods are aggregated. The absence of comments opposing elimination of a quantity measure and aggregating time period (or, indeed, of any comments suggesting these measures) demonstrates "the final rule substantially departs from the terms or substance of the proposed rule, [and thus] the notice is inadequate." *Chocolate Mfrs Ass'n*, 755 F.2d 1055.

## COUNT VI
## VIOLATION OF APA § 706(2)(B)- DENIAL OF THE CONSTITUTIONAL RIGHT TO EQUAL PROTECTION OF THE LAWS

153. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

CORE/2052922.0049/154461210.5

154. A court must "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

155. The Due Process Clause of the Fifth Amendment to the U.S. Constitution forbids the federal government from denying equal protection of the laws.[73] It is an equal protection violation where a "discriminatory purpose" was a "motivating factor" in a government decision.[74]

156. The Public Charge Rule was motivated by Defendants' intent to discriminate on the basis of race, ethnicity, national origin, and nationality.

157. The Public Charge Rule discriminates on the basis of race, ethnicity, national origin, and nationality, and was motivated by discriminatory and baseless stereotypes concerning the receipt of public benefits by immigrants, particularly immigrants from Latin American, African and Asian countries. Defendants' statements provide direct evidence of their discriminatory motives in enacting the Public Charge Rule.

158. In addition, the Public Charge Rule will cause Latinos, Asians, and Africans to be disproportionately excluded from the United States. An analysis of the Public Charge Rule found that it would potentially block up to 71 percent of all applicants from Mexico and Central America, 69 percent of applicants from Africa, and 52 percent of applicants from

---

[73] *See, e.g., Davis v. Passman*, 442 U.S. 228, 234 (1979); *Bolling v. Sharpe*, 347 U.S. 497, 500 (1954).

[74] *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977). *See also*, *Mayor and City Council of Baltimore v. Trump, et al.*, No. 1:18-cv-3636-ELH, 2019 WL 4598011, at *19 (D. Md. September 20, 2019) ("if President Trump harbors animus towards immigrants of color, and if he encouraged the State Department to revise the FAM, then the amendments violate equal protection, even if officials within the State Department did not personally harbor racial animus.) *See also NAACP v. U.S. Dep't of Homeland Sec.*, 364 F. Supp. 3d 568, 578 (D. Md. 2019); *Saget v. Trump*, 345 F. Supp. 3d 287, 303 (E.D.N.Y. 2018); *Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1123-24 (N.D. Cal. 2018).

CORE/2052922.0049/154461210.5

Asia. *Mayor and City Council of Baltimore v. Trump*, No. 1:18 cv 3636, 2019 WL 4598011, at *6 (September 20, 2019).

159. The Public Charge Rule fails strict scrutiny because its broad focus on the receipt of "public assistance" by immigrants is not narrowly tailored to the goal of preventing immigrants from becoming primarily dependent upon public benefits.

160. Through the actions described in this Complaint, the Public Charge Rule violates the APA as contrary to the Fifth Amendment's Due Process Clause.

161. Plaintiffs have standing to assert violations of the APA. In addition, local governments may assert the equal protection claims of their immigrant residents and their families. Baltimore and Gaithersburg are injured by the Public Charge Rule, as described above. *See supra* ¶¶ 8-15.

162. Baltimore and Gaithersburg have close relationships with those who take their public benefits, including their medical, legal, educational, food, and housing services. Because Plaintiff local governments are better off when all of their residents can access the public benefits to which they are entitled, regardless of immigration status, Baltimore and Gaithersburg will serve as especially effective advocates for their equal protection claims.

163. Finally, Baltimore's and Gaithersburg's immigrant residents and their families face impediments to bringing their claims in their own names because they fear the potential immigration consequences of coming forward, suffer from language-related and other barriers, and cannot bear the significant economic and logistical burdens of participating in litigation. *Cf. Mayor and City Council of Baltimore v. Trump, et al.*, No. 1:18-cv-3636-ELH, 2019 WL 4598011, at *12-13 (D. Md. September 20, 2019); *Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718, 732 (S.D. Ind.), *aff'd*, 838 F.3d 902 (7th Cir. 2016) (concluding that social services organization could assert equal protection claims of its refugee clients).

CORE/2052922.0049/154461210.5

# PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

1.     Declare that the Public Charge Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A);

2.     Declare that the Public Charge Rule is without observance of procedure required by law within the meaning of 5 U.S.C. §§ 706(2)(D) and 553(b) and (c);

3.     Declare the Public Charge Rule is contrary to the Equal Protection Clause;

4.     Vacate and set aside the Public Charge Rule;

5.     Enjoin the Department and all its officers, employees, and agents, and anyone acting in concert with them, from implementing, applying, or taking any action whatsoever under the Public Charge Rule;

6.     Postpone the effective date of the Public Charge Rule pursuant to 5 U.S.C. § 705;

7.     Grant such other relief as the Court may deem proper.


**STINSON LLP**

Dated: September 27, 2019          By: _____ */s/ M. Roy Goldberg* _____
                                        M. Roy Goldberg (MD #14240)
                                        Brandon R. Nagy (D. Md. #20834)
                                        Michael E. Tucci (MD #14744)
                                        Harvey Reiter (DC #232942)
                                        Dennis Lane (DC #953992)
                                        Motions for *pro hac vice* admission of Mr.
                                        Reiter and Mr. Lane to be filed

CORE/2052922.0049/154461210.5

1775 Pennsylvania Avenue N.W., Suite 800
Washington, DC 20006-4605
Phone: 202.728.3005
Fax:      202.785-9163
Email:  roy.goldberg@stinson.com
Email:  brandon.nagy@stinson.com
Email:  michael.tucci@stinson.com
Email:  harvey.reiter@stinson.com
Email:  dennis.lane@stinson.com

Christina J. Hansen (KS #26008)
Motion for *pro hac vice* admission to be filed
1625 N. Waterfront Parkway, Suite 300
Wichita, KS 67206-6620
Phone: 316.268.7947
Fax: 316.268.9766
Email: christina.hansen@stinson.com

Andrew Davis (MN #0386634)
Motion for *pro hac vice* admission to be filed
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Phone: 612.335.1500
Fax: 612.335.1657
Email: andrew.davis@stinson.com

*Attorneys for Plaintiffs City of Gaithersburg,
Maryland; Maryland State Senator Jeff
Waldstreicher; Friends of Immigrants;
Immigrant Law Center of Minnesota; The
Jewish Council for Public Affairs; Tzedek DC*


**CITY OF BALTIMORE DEPARTMENT
OF LAW**

Andre M. Davis (MD #00362)
City Solicitor
Suzanne Sangree (MD #26130)
Senior Counsel for Public Safety & Director of
Affirmative Litigation
Jane Lewis (MD # 20981)
City of Baltimore Department of Law
City Hall, Room 109
100 N. Holliday Street

CORE/2052922.0049/154461210.5

Baltimore, MD 21202
Phone: 443.388.2190
Fax: 410.576.7203
Email: Andre.Davis@baltimorecity.gov
Email: suzanne.sangree2@baltimorecity.gov
Email: jane.lewis@baltimorecity.gov

*Attorneys for Plaintiff Mayor and City Council
of Baltimore*

**SANDLER, REIFF, LAMB, ROSENSTEIN
& BIRKENSTOCK PC**

Joseph E. Sandler (MD #04324)
1090 Vermont Ave., N.W.  Suite 750
Washington, D.C. 20005
Phone: 202.479.1111
Fax: 202.479.1115
Email: sandler@sandlerreiff.com

*Attorney for Plaintiff Jewish Community
Relations Council of Greater Washington*

CORE/2052922.0049/154461210.5